THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

BRANDI WORTHAM                                                      PLAINTIFF

v.                              Case No. 4:19-cv-00069-KGB

CITY OF BENTON, ARKANSAS                                            DEFENDANT

## ORDER

Plaintiff Brandi Wortham brings this action against defendant City of Benton, Arkansas, alleging violations of the Americans with Disabilities Act ("ADA"), 42 § U.S.A. § 12131 *et seq*., and its implementing regulations, 28 C.F.R. Part 35; Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 791; and the Arkansas Civil Rights Act ("ACRA"), Arkansas Code Annotated § 16-123-107 (Dkt. No. 24).  Both Ms. Wortham and the City of Benton have filed motions for summary judgment (Dkt. Nos. 33, 38).  Both parties have responded in opposition to the other's motion for summary judgment (Dkt. Nos. 43, 46).  For the reasons discussed below, the Court denies the City of Benton and Ms. Wortham's motions for summary judgment.

### I.      Overview

The City of Benton moves for summary judgment asserting that Ms. Wortham received effective communication during her actions with the Benton Police Department ("BPD"), that Ms. Wortham was not denied meaningful access to any service provided by the City of Benton, and that Ms. Wortham purportedly has not demonstrated deliberate indifference on the part of the City of Benton (Dkt. No. 39, at 2).  Ms. Wortham argues that BPD's repeated reliance on her minor children to interpret was a *per se* violation of law, that BPD's reliance on Ms. Wortham's friends failed to comply with the legal standards for an accompanying adult, that BPD's written communication with Ms. Wortham was ineffective, and that no exigent circumstances justified

BPD's actions (Dkt. No. 33, at 1-2).  Further, Ms. Wortham argues that the City of Benton acted with deliberate indifference in violation of her civil rights (*Id.*).

## II.   Factual Background

Plaintiff Brandi Wortham was born deaf, and her primary and preferred method of communication is American Sign Language ("ASL") (Dkt. No. 45, ¶ 1).  Ms. Wortham has four children.  Three of her children lived with her during the relevant time periods:  Landon "Dave" Morrow, Chloe Wortham, and Cameron Wortham (*Id.*, ¶ 2).  Ms. Wortham communicates with her children through American Sign Language, and she primarily communicates with Chloe through American Sign Language (Dkt. Nos. 40, ¶¶ 3-4; 44, ¶¶ 3-4).

Ms. Wortham attended high school at the Arkansas School for the Deaf (Dkt. No. 45, ¶ 4).  She graduated from high school and did not obtain any additional education thereafter (*Id.*, ¶ 5).  Ms. Wortham has difficulty reading and writing in the English language to communicate complex information (*Id.*, ¶ 6).  Ms. Wortham considers herself capable of reading at only a fourth or fifth grade level (*Id.*, ¶ 7).  Ms. Wortham cannot read lips (*Id.*, ¶ 8).  Her children's school provides her with an interpreter so that she can communicate with the school about her children's education (*Id.*, ¶ 9).

According to Ms. Wortham, her claims against the City of Benton stem from 13 interactions with the BPD occurring on:  March 11, 2017; March 1, 2018; April 7, 2018; May 21, 2018; July 2, 2018; July 5, 2018; September 25, 2018; November 24, 2018; November 27, 2018; March 26, 2019; June 5, 2019; September 27, 2019; and September 30, 2019 (*Id.*, ¶ 11).

On or about March 11, 2017, at or about 1:30 p.m., Ms. Wortham hosted a birthday party for her youngest son, Cameron Wortham, at her home (*Id.*, ¶ 14).  Chloe Wortham, plaintiff's daughter, who attended the birthday party, told two relatives, Tammy Townsend and Candace

Benham who were both present for the party, that Chloe's older brother Dave attempted to touch her inappropriately the evening prior (*Id.*, ¶ 15).  Chris Benham is a detective at the BPD and was present for the party (*Id.*, ¶ 16).  Detective Benham called the BPD and reported a possible sexual assault (*Id.*, ¶ 17; *see also* Dkt. Nos. 40, ¶¶ 9-10; 44, ¶¶ 9-10)

Subsequently, Seth Hopkins, a police officer from the BPD, responded to the report and arrived at Ms. Wortham's residence (Dkt. No. 45, ¶ 18).  During Officer Hopkins' investigation, Officer Hopkins interviewed Chloe in the presence of her mother Ms. Wortham in her home (*Id.*, ¶ 19).  Chloe wanted her mother to be present for her interview and wanted her mother to understand what was being said during the interview (*Id.*, ¶ 20).  Despite becoming aware that Ms. Wortham was deaf, Officer Hopkins did not obtain a qualified ASL interpreter to come to the scene (*Id.*, ¶ 21).  Ms. Wortham requested Officer Hopkins provide an ASL interpreter (*Id.*, ¶ 22).  Despite this request, Officer Hopkins failed and/or refused to obtain and ASL interpreter (*Id.*, ¶ 23).

To communicate with Ms. Wortham, Officer Hopkins wrote notes in English with Ms. Wortham and used Chloe as an interpreter for Ms. Wortham (*Id.*, ¶ 24).  Ms. Wortham did not want Chloe to interpret and did not want to write notes; rather Ms. Wortham wanted to utilize a qualified interpreter (*Id.*, ¶ 25).  Chloe did not feel comfortable acting as a translator for Ms. Wortham and was not able to communicate effectively everything Officer Hopkins said to Ms. Wortham (*Id.*, ¶ 26).

Subsequently, Ms. Wortham, Chloe, Dave, Dave's friend Johnny, Tammy Townsend, Candace Benham, and Detective Benham went to the BPD to continue the investigation (*Id.*, ¶ 29).  Ms. Wortham transported Dave and Johnny, and Detective Benham transported Chloe to the police station for further interviewing; no one was transported to the police station by the BPD, either as

a courtesy or in custody ((Dkt. Nos. 40, ¶¶ 12-13; 44, ¶¶ 12-13).  Ms. Wortham and her son, Dave, were instructed to go inside a room to be interviewed (Dkt. No. 45, ¶ 30).  Sergeant Dustin Hamm who was a detective at the time of the incident, conducted two interviews with Dave about the potential sexual assault in the presence of Ms. Wortham (*Id.*, ¶ 31).  To communicate with Ms. Wortham at the police station, Sergeant Hamm wrote written and typed notes with Ms. Wortham in English and used Dave as an interpreter for Ms. Wortham; Dave and Ms. Wortham communicated by signing (Id., ¶ 34; *see also* (Dkt. Nos. 40, ¶¶ 15-16; 44, ¶¶ 15-16)).

At the time of this incident, Chloe was only 12 years old (Dkt. No. 45, ¶ 38).  At the time of the incident, Dave was a juvenile (*Id.*, ¶ 39).

Detective Benham never received any training from the City of Benton on how to accommodate people with disabilities (*Id.*, ¶ 40).  Detective Benham has never utilized a professional sign language interpreter (*Id.*, ¶ 41).  Detective Benham has never been informed or trained that, if a deaf person requests an interpreter from a police officer, the officer should take reasonable steps to obtain that interpreter as soon as possible (*Id.*, ¶ 42).  Sergeant Hamm never asked Ms. Wortham if she wanted an interpreter to communicate on March 11, 2017 (*Id.*, ¶ 43).  Sergeant Hamm has never received any training from the City of Benton on how to accommodate individuals with disabilities (*Id.*, ¶ 44).  Prior to March 11, 2017, Sergeant Hamm does not recall ever providing an interpreter to anyone for any language (*Id.*, ¶ 45).  Officer Hopkins has never received any training from the City of Benton on how to obtain interpreters for people speak foreign languages (*Id.*, ¶ 46).

On March 1, 2018, Ms. Wortham reported to the BPD that her son Dave had stolen her phone.  When BPD responded to the call, Dave stated that he had permission to use the phone but

returned it to Ms. Wortham; Ms. Wortham declined to file a report (Dkt. No. 40, ¶¶ 20-21; Dkt. No. 44, ¶¶ 20-21).

On April 7, 2018, Ms. Wortham reported a disturbance of two people at her home.  When BPD responded to the call, BPD advised two individuals to leave and that they should not return to the property or they could be arrested for criminal trespass (Dkt. No. 40, ¶¶ 22-23; Dkt. No. 44, ¶¶ 22-23).

On or about May 21, 2018, Ms. Wortham reported a theft to the BPD (Dkt. No. 45, ¶ 50). Officer Matthew Kuntz took Ms. Wortham's report (*Id.*, ¶ 51).  Officer Corey Green responded to Ms. Wortham's home to investigate a report of theft (*Id.*, ¶ 59).  Officer Green relied on Chloe, a minor, to act as an interpreter for Ms. Wortham (*Id.*, ¶ 60; *see also* Dkt. No. 40, ¶¶ 26-29; Dkt. No. 44, ¶¶ 26-29).

Ms. Wortham reported to police that an individual on April 27 had stolen two PlayStation 4 games, shoes, shirts, a jacket, and an iPhone 7 Plus.  Ms. Wortham was asked to report the serial number of the phone to the police when she figured out what it was (Dkt. No. 40, ¶ 32; Dkt. No. 44, ¶ 32).

On or about July 5, 2018, Officer Turner followed up on this investigation (Dkt. No. 40, ¶¶ 34-35; Dkt. No. 44, ¶¶ 34-35).  Ms. Wortham reported that the individual could be reached in the Saline County Jail.  She did not have the serial number to the phone and did not know the passcode to the phone as well.  She was advised to report the serial number of the phone so that the police could proceed with the investigation (*Id.*).

Ms. Wortham called the BPD in order to report someone unwelcome in her home.  BPD reported that because the owner was "hearing impaired" officers had to "type" communications; Ms. Wortham was not provided a sign language interpreter (Dkt. No. 45, ¶ 62).  On or about

September 25, 2018, Ms. Wortham reported to the BPD that she wanted two persons removed from her property ((Dkt. No. 40, ¶¶ 37-38; Dkt. No. 44, ¶¶ 37-38).  Police advised the individuals to leave the property or they would be arrested for trespassing.  Police supplemented that, as of November 24, 2018, one individual about whom Ms. Wortham complained lived at the residence (*Id.*).

On or about November 24, 2018, Ms. Wortham was questioned in response to a theft reported by another individual (Dkt. No. 40, ¶¶ 40-41; Dkt. No. 44, ¶¶ 40-41).  The individual reporting the theft was ultimately removed from the property and arrested (*Id.*).  That individual reported that three prescription hydrocodone had been stolen from him (*Id.*).

On or about December 27, 2018, Ms. Wortham reported that an individual was unwelcome in her home (Dkt. No. 40, ¶ 44; Dkt. No. 44, ¶ 44).

On January 30, 2019, this lawsuit was filed against the City of Benton (Dkt. No. 45, ¶ 63).

On or about March 26, 2019, Ms. Wortham reported a vehicle theft, and Chloe communicated with Officer Robinson on Ms. Wortham's behalf (Dkt. No. 40, ¶¶ 48-49; Dkt. No. 44, ¶¶ 48-49).  Ms. Wortham reported that her ex-husband had recently been released from jail and had stolen her vehicle (*Id.*).  On or about June 5, 2019, BPD followed up on the vehicle theft (*Id.*, ¶ 51).  On or about June 5, 2019, BPD followed up with Ms. Wortham about her vehicle theft and, again, provided no qualified interpreter (Dkt. No. 45, ¶ 68).

On or about September 27, 2019, Ms. Wortham called the BPD to report her abusive boyfriend (*Id.*, ¶ 69).  Officer Jacob Griffith arrived at the scene and observed Ms. Wortham to be deaf (*Id.*, ¶ 70).  Officer Griffith wrote in his report, "Wortham was deaf and had a friend with her that knew some sign language but was not fluent.  Therefore, communication was difficult." (*Id.*, ¶ 71).  Officer Griffith was aware that Ms. Wortham's usual method of communication was sign

language (*Id.*, ¶ 72).  Despite this observation, Officer Griffith made no efforts to secure a sign language interpreter (*Id.*, ¶ 73).  Ms. Wortham went to the BPD for further questioning (*Id.*, ¶ 74).  At the BPD, there was no imminent threat or danger to Ms. Wortham or her friend during Ms. Wortham's interview (*Id.*, ¶ 75).  Ms. Wortham does not dispute the contents of Officer Griffith's report but disputes the accuracy of those contents based upon difficulty in communicating with Officer Griffith (Dkt. No. 40, ¶¶ 53-56; Dkt. No. 44, ¶¶ 53-56).  The parties agree the individual moved out of Ms. Wortham's residence on September 30, 2019 (*Id.*).

On or about September 30, 2019, the BPD executed a "knock and talk" on Ms. Wortham's residence (*Id.*, ¶ 80).  BPD searched Ms. Wortham's home (Dkt. No. 45, ¶ 82).  Officer Bennet was never trained on how to offer a deaf person a sign language interpreter by the City of Benton (*Id.*, ¶ 85).  Officer Bennett recalls Ms. Wortham requesting an interpreter in the past.  Officer Bennett knew Ms. Wortham was deaf on September 30, 2019, and he even recalls Ms. Wortham requesting an interpreter in the past (*Id.*, ¶ 86).  On September 30, 2019, Officer Bennett never asked Ms. Wortham how she preferred to communicate (*Id.*, ¶ 87).  Ms. Wortham admits that she signed a search waiver to allow the BPD to search her home, but she disputes that she signed the document voluntarily or understood what she was signing (Dkt. No. 40, ¶ 56; Dkt. No. 44, ¶ 56).  Ms. Wortham was not charged with any crime or placed under arrest as a result of this incident (Dkt. No. 40, ¶ 60; Dkt. No. 44, ¶ 60).

The BPD had a policy manual effective December 15, 2016, and updated that manual on February 3, 2020, but the parties dispute whether either version of the manual complied or complies with the ADA (Dkt. No. 40, ¶¶ 61-62; Dkt. No. 44, ¶¶ 61-62).  Numerous officers with BPD have not received specific training on what to do if they encounter a deaf or hard of hearing

individual (Dkt. No. 45, ¶ 88).  Prior to February 2020, the BPD did not have any written policies regarding the legality of using accompanying adults as interpreters (*Id.*, ¶ 94).

### III.    Legal Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the moving party is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   A factual dispute is genuine if the evidence could cause a reasonable fact finder to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.   *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).

The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Given the 'inherently fact-intensive' nature of the inquiry, 'an effective-communication claim often presents questions of fact precluding summary judgment.'"  *Hooper v. City of St. Paul*, No. 17-CV-3442 (PJS/DTS), 2019 WL 4015443, at *6 (D. Minn. Aug. 26, 2019) (quoting *Crane v. Lifemark Hosp., Inc.*, 898 F.3d 1130, 1135 (11th Cir. 2018) (citation omitted); *see also Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001) ("Generally, the

8

effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment." (citations omitted)).

## IV.     Analysis

### A.     Claims Under The ADA And RA

#### 1.     Applicable Law

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The RA establishes the same requirements for entities that receive federal funding. 29 U.S.C. § 794. These laws were passed for the purpose of addressing and correcting the history of inequality that disabled persons have faced in attempting to access public services. *See* 42 U.S.C. § 12101; 29 U.S.C. § 794. In passing these laws, Congress recognized the discrimination disabled persons historically faced and sought "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(7). Although there are differences between the ADA and the RA, including the RA's federal funding requirement, the case law interpreting the two statutes is generally used interchangeably. *Durand v. Fairview Health Servs.*, 902 F.3d 836, 841 (8th Cir. 2018); *Bahl v. Cty. of Ramsey*, 695 F.3d 778, 783 (8th Cir. 2012); *Loye v. Cty. of Dakota*, 625 F.3d 494, 496 (8th Cir. 2010); *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998).

To establish a violation under the ADA or the RA, Ms. Wortham must prove that: (1) she is a person with a disability, (2) the City of Benton is a public entity covered by the laws for ADA purposes or receives federal funding for RA purposes, and (3) she was denied the benefits of the City of Benton's services, programs, or activities because of her disability. *Randolph v. Rodgers*,

170 F.3d 850, 858 (8th Cir. 1999); *Hooper v. City of St. Paul*, No. 17-CV-3442 (PJS/DTS), 2019 WL 4015443, at *5 (D. Minn. Aug. 26, 2019).

Moreover, because Ms. Wortham seeks compensatory damages from the City of Benton under the ADA and RA, she also needs to establish that the City of Benton was "deliberately indifferent" to her rights. *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011); *Hooper*, 2019 WL 4015443, at *5; *see also Barber ex rel. Barber v. Colo. Dep't Of Revenue,* 562 F.3d 1222, 1228 (10th Cir. 2009). To recover compensatory damages under Section 504, a plaintiff must establish that the agency's discrimination was intentional; this does not require "a showing of personal ill will or animosity toward the disabled person; rather, 'intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights.'" *Barber*, 562 F.3d at 1228-29.

As an affirmative defense to the ADA or RA, a defendant may demonstrate that the requested accommodation would constitute an undue burden. *See Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999). The exact form of auxiliary aid necessary is left up to the public accommodation, but, once the public accommodation determines that an aid is needed, it must provide that aid unless doing so would be an undue burden or would fundamentally alter the nature of the provided benefit. 42 U.S.C. § 12182(b)(2)(A)(iii). Both the undue burden and the fundamental alteration arguments are affirmative defenses provided by the ADA. *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (citing 28 C.F.R. § 35.150(a)(3)). Failure to raise an affirmative defense before the district court constitutes waiver of that defense. *Warner Bros. Entm't, Inc. v. X One X Prods.*, 840 F.3d 971, 980 (8th Cir. 2016).

Title II of the ADA prohibits qualified individuals with disabilities from being excluded from participation in or the benefits of the services, programs, or activities of a public entity.  A qualified individual with a disability is defined as any person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2); *see also Randolph v. Rodgers*, 170 F.3d 850, 857 (8th Cir. 1999).  The term "public entity" is defined as "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C. § 12131(1); *see also Randolph*, 170 F.3d at 857.

The RA provides that no otherwise qualified individual with a disability shall be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  The RA defines "program or activity" to include "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b).

In determining whether Ms. Wortham has been denied the benefit of a public service because of her disability, the Court considers whether she received "'meaningful access' to a public entity's services, not merely 'limited participation.'"  *Loye*, 625 F.3d at 496 (quoting *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999)).  The Eighth Circuit has determined that providing meaningful access does not require public entities to produce the same level of achievement between disabled and non-disabled individuals, but rather requires these entities to provide disabled individuals with an "equal opportunity. . . to gain the same benefit" to services provided.  *Loye*, 625 F.3d at 499 (quoting *Alexander v. Choate*, 469 U.S. 287, 305-306 (1985)).  Depending on the circumstances, this may require the use of "auxiliary aids and services," such as interpreters for the hearing impaired.  *Loye*, 625 F.3d at 496-97; *see also Mason v. Corr.*

11

*Med. Servs., Inc.,* 559 F.3d 880, 886 (8th Cir. 2009)(applying 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104(2)).

Whether there was "effective communication"—and thus "meaningful access" to a service—is "a fact-intensive inquiry and is largely context-dependent." *Durand v. Fairview Health Servs.*, 902 F.3d 836, 842 (8th Cir. 2018) (citations omitted). Given the "inherently fact-intensive" nature of the inquiry, "an effective-communication claim often presents questions of fact precluding summary judgment." *Hooper v. City of St. Paul*, No. 17-CV-3442 (PJS/DTS), 2019 WL 4015443, at *6 (D. Minn. Aug. 26, 2019) (quoting *Crane v. Lifemark Hosp., Inc.*, 898 F.3d 1130, 1135 (11th Cir. 2018) (citation omitted), and citing *Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment." (citations omitted))).

When examining record evidence in these types of cases, a plaintiff's affidavit must be considered, and its particular factual allegations scrutinized for "independent documentary evidence" to support them. *O'Bryan v. KTIV Television,* 64 F.3d 1188, 1191 (8th Cir. 1995). "In a case such as this, it is especially important to consider the complainant's testimony carefully because 'the individual with a disability is most familiar with his or her disability and is in the best position to determine what type of aid or service will be effective.'" *Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013) (citing with approval U.S. Dep't of Justice, The Americans with Disabilities Act Title II Technical Assistance Manual, at II–7.1100 (1993)).

The Eighth Circuit has held that a plaintiff's failure to request an accommodation at each incident does not prevent liability where the public entity is on notice of the need for an accommodation and refuses to engage with the request. *See Randolph*, 170 F.3d at 858-59 ("While it is true that public entities are not required to guess at what accommodations they should provide,

the requirement does not narrow the ADA or RA so much that the Department of Corrections may claim Randolph failed to request an accommodation when it declined to discuss the issue with him.").

In her motion for summary judgment, Ms. Wortham cites extensively to regulations implementing Title II. In its analysis, the Court considers that Section 12134 of the ADA authorizes the Attorney General to promulgate regulations to implement Title II. 42 U.S.C. § 12134(a). In an *en banc* decision, the Seventh Circuit Court of Appeals explained with respect to these regulations:

> The Supreme Court never has decided whether these regulations are entitled to the degree of deference described in *Chevron, U.S.A. Inc. v. National [Natural] Resource[s] Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Nevertheless, the Court has said that, "[b]ecause the Department of Justice is the agency directed by Congress to issue regulations implementing Title II. . . its views warrant respect." *Olmstead v. L.C.,* 527 U.S. 581, 597–98, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (internal citations omitted).

*Wisconsin Community Servs., Inc. v. City of Milwaukee,* 465 F.3d 737, 751 n. 10 (7th Cir. 2006) (*en banc* ). Other courts have also held that, because Congress directed the Attorney General or the Department of Justice ("DOJ") to "elucidate Title II [of the ADA] with implementing regulations, DOJ's views at least would 'warrant respect' and might be entitled to even more deference." *Frame v. City of Arlington,* 657 F.3d 215, 225 (5th Cir.2011); *Armstrong v. Schwarzenegger,* 622 F.3d 1058, 1065 (9th Cir.2010) ("'Department of Justice regulations interpreting Title II should be given controlling weight unless they are 'arbitrary, capricious, or manifestly contrary to the statute.'" (quoting *McGary v. City of Portland,* 386 F.3d 1259, 1269 n. 6 (9th Cir. 2004), in turn quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844 (1984))).

The Attorney General's authority to promulgate regulations to implement Title II of the ADA is important here, because, as the Seventh Circuit Court of Appeals has also explained, "Title II of the ADA does not contain a specific accommodation requirement. Instead, the Attorney General, at the instruction of Congress, has issued an implementing regulation [28 C.F.R. § 35.130(b)(7)] that outlines the duty of a public entity to accommodate reasonably the needs of the disabled." *Wisconsin Community Servs., Inc.,* 465 F.3d at 750–51; *accord Frame v. City of Arlington,* 657 F.3d 215, 231 (5th Cir. 2011) (noting that Title II does more than prohibit disability discrimination by a public entity, because it "imposes an 'obligation to accommodate,' or a 'reasonable modification requirement,'" but expressing no opinion "as to whether (or when) a failure to make reasonable accommodations should be considered a form of intentional discrimination, a form of disparate impact discrimination, or something else entirely"); *Pena v. Bexar County, Texas,* 726 F.Supp.2d 675, 683 (W.D. Tex. 2010) (determining that Title II of the ADA "imposes upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals") (citing *Bennett–Nelson v. La. Bd. of Regents,* 431 F.3d 448, 454 (5th Cir.2005)); *see also Sak v. City of Aurelia, Iowa*, 832 F. Supp. 2d 1026, 1039–40 (N.D. Iowa 2011).

**2. Analysis Of The City Of Benton And Ms. Wortham's Motions For Summary Judgment**

**a. The Benefit Of A Service Based On Her Disability**

In support of its motion for summary judgment, the City of Benton argues that Ms. Wortham "has not identified the specific City service of which she was denied its benefit," seeming to suggest that because Ms. Wortham was involved in "pre-investigatory actions" and "never arrested, interrogated, or otherwise detained" she cannot maintain her claims (Dkt. No. 38, at 4-5). The Court declines to find as a matter of law on the legal authorities cited and record evidence

presented that the City of Benton cannot be liable for denying Ms. Wortham the benefit of a service based on her disability given the circumstances and numerous interactions between the BPD and Ms. Wortham.

As the Eighth Circuit recognized in *Bahl v. County of Ramsey*:

> Courts have broadly construed the "services, programs, or activities" language in the ADA to encompass "anything a public entity does." Department of Justice regulations confirm that "title II applies to anything a public entity does." In addition, courts also have recognized that the discrimination in the provision of services as outlined in the ADA is an injury in itself.

695 F.3d 778, 787-88 (8th Cir. 2012) (internal citations omitted). *See also Camarillo v. Carrols Corp.,* 518 F.3d 153, 158 (2d Cir. 2008) (reversing the district court's dismissal of ADA claim brought by legally blind patron of fast food restaurants on grounds that she was still able to eat at the restaurants and thus suffered no harm, holding that plaintiff's injury arose from the restaurant's "discriminatory failure to ensure effective communication of their menu items."); *Robertson v. Las Animas County Sheriff's Dept.,* 500 F.3d 1185, 1199 (10th Cir. 2007) (holding that a deaf arrestee was injured as a result of defendants' failure to provide him with an auxiliary aid at his probable cause hearing. "Though the charges against plaintiff were dismissed, he was denied the ability to participate in his probable cause hearing to the same extent as non-disabled individuals."); *Armstrong v. Davis,* 275 F.3d 849, 865 (9th Cir. 2001) (holding that a parole board's "failure to make accommodations that would enable [disabled prisoners and parolees] to attend or comprehend parole and parole revocation hearings. . . in itself, constitutes 'actual injury'" under the ADA and RA).

Further, in applying Title II of the ADA to state prisons and prison services in *Pennsylvania Department of Corrections v. Yeskey,* 524 U.S. 206 (1998), Justice Scalia emphasized the broad language used by Congress, and its choice not to include exceptions. 524 U.S. at 212. State prisons

"fall squarely within the statutory definition of 'public entity'" since § 12131(1)(B) defines public entity as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* at 210. The Court categorically rejected the argument that the statutory prohibition against excluding a qualified individual with a disability from participating in or receiving the "benefits of the services, programs, or activities of a public entity" does not apply to prison services because they do not fit the common understanding of "benefits" or "services," for "[t]he text of the ADA provides no basis for distinguishing these programs, services, and activities." *Id.* For similar reasons, the Eighth Circuit in *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998), held that a local police department falls "squarely within the statutory definition of 'public entity.'"

Likewise, voluntariness also does not dictate coverage; covered programs or services do not need to be voluntary, for "the words [of the statute] do not connote voluntariness." *Yeskey*, 524 U.S. at 211. A qualified individual may participate in a service on either a voluntary or a mandatory basis. *Id.*

For these reasons, the Court denies the City of Benton's motion for summary judgment and rejects the argument that Ms. Wortham cannot as a matter of law demonstrate that she was denied the benefit of a public entity's service.

### b.       Whether Effective Communication Occurred

The City of Benton maintains that, even if the BPD's various interactions with Ms. Wortham constituted a service, the City of Benton should be granted summary judgment because the BPD "resolved all of Ms. Wortham's complaints in her favor and because she was allowed to participate in a police investigation involving her daughter, Ms. Wortham has not been discriminated against by the City." (Dkt. No. 38, at 5-6). In her motion for summary judgment,

16

Ms. Wortham argues that BPD discriminated against her in violation of Title II of the ADA and Section 504 of the RA (Dkt. No. 33).

The City of Benton acknowledges:  "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communications involved; and the context in which the communication is taking place," and that, "[i]n determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities." (Dkt. No. 38, at 5-6 (citing 28 C.F.R. § 35.160(b)(2)). Further, the City of Benton states:  "Generally, a public entity should not use adults or children accompanying a deaf individual to facilitate communication but may rely on them when there is an emergency involving an imminent threat to the safety or welfare of an individual when there is no interpreter available.  28 C.F.R. § 35.160(c)." (Dkt. No. 38, at 10).

A public entity also may not rely upon an accompanying adult to interpret except in situations where the "imminent threat exception" applies or "where the individual with a disability specifically requests that the accompanying adult interpret or facilitate communication, the accompany adult agrees to provide such assistance, and reliance on that adult for such assistance is appropriate under the circumstances."  28 C.F.R. § 35.160(c)(2); *see also* 28 C.F.R. § 35.160(c)(1) ("A public entity shall not require an individual with a disability to bring another individual to interpret for him or her.").

Although the City of Benton cites to certain of the regulations that provide guidance with respect to meaningful access, the City of Benton fails to explain persuasively how the cited law and regulations apply to the record evidence.  The Court declines to find as a matter of law on the record evidence that the City of Benton provided Ms. Wortham meaningful access in the light of

her disability given the numerous interactions between the BPD and Ms. Wortham and the genuine issues of material fact that remain in dispute.

There is specific evidence when viewed in the light most favorable to Ms. Wortham from which a reasonable jury could conclude that the City of Benton through the BPD ignored or refused a specific request from Ms. Wortham for an interpreter.  *Cf. Loye*, 625 F.3d at 500; *Bahl*, 695 F.3d at 786.  During the March 11, 2017, incident that began at Ms. Wortham's home, all parties agree that Ms. Wortham requested an interpreter and yet the BPD did not provide one to her at her home nor later at the BPD station.  On May 21, 2018, Ms. Wortham maintains that she requested an interpreter but was told that a sign language interpreter would take hours.  On November 27, 2018, BPD reported that Ms. Wortham was "hearing impaired" and that officers had to "type" communications, despite Ms. Wortham requesting an interpreter.

Further, based on record evidence construed in the light most favorable to Ms. Wortham, these types of incidents continued even after Ms. Wortham filed this lawsuit against the City of Benton.  Ms. Wortham alleges this occurred again during the incident on or about June 5, 2019, when BPD followed up with Ms. Wortham about her vehicle theft and again provided no qualified interpreter.  She also maintains the BPD failed to comply with the ADA and RA on or about September 27, 2019, when Ms. Wortham called the BPD to report her abusive boyfriend; Officer Jacob Griffith arrived at the scene and observed Ms. Wortham to be deaf; and Officer Griffith wrote in his report, "Wortham was deaf and had a friend with her that knew some sign language but was not fluent.  Therefore, communication was difficult."  Ms. Wortham also challenges the events of September 30, 2019, when the BPD executed a "knock and talk" on Ms. Wortham's residence.

18

The record evidence demonstrates that BPD relied on Ms. Wortham's minor children and an adult friend to communicate with Ms. Wortham during certain interactions.  Despite this, given the disputed issues of material fact presented in the record before the Court, the Court determines that a fact finder should resolve whether there existed an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available as the City of Benton contends, so as to justify the BPD's purported reliance on Ms. Wortham's minor children or adult friend to serve as interpreters for her, especially on occasions where Ms. Wortham specifically requested an interpreter be provided by the City of Benton.

According to Ms. Wortham, who provides record cites, there is record evidence that Detective Benham described the investigation at Ms. Wortham's house on March 11, 2017, as a situation not involving an imminent threat to anyone's life; further, the later questioning that day at the BPD station draws doubt as to whether there was an imminent threat to anyone's life (Dkt. No. 33-1, at 16).  There also is record evidence that BPD Officer Green on November 24, 2018, felt that the scene was secure and that it was possible to bring in a qualified interpreter (*Id.*).  Likewise, there is record evidence that BPD Officer Griffith could have safely secured an interpreter for Ms. Wortham on September 27, 2019 (*Id.*).

There also is record evidence that the BPD relied upon Ms. Wortham's adult friends to communicate with Ms. Wortham.  On September 27, 2019, Officer Griffith wrote in his report that Ms. Wortham "was deaf and had a friend with her that knew some sign language, but was not fluent.  Therefore, communication was difficult." (Dkt. No. 33-10, at 64).  Officer Griffith admitted he was aware Ms. Wortham's usual method of communication was sign language, that he could have called for an interpreter to provide interpretation, but that he chose not to do so (Dkt. No. 33-11, at 10).

Ms. Wortham takes the position that the BPD's failure to provide interpreters in the various interactions with her resulted in her being unsure if she was being understood by the BPD, left her unable to ask the BPD the questions she wanted to ask, and created significant difficulty in her understanding the various interactions (Dkt. No. 44, 67-68). Ms. Wortham claims that, as a result of BPD's actions, she suffered fear, anxiety, indignity, and humiliation, and deterrence from seeking the aid or protection of the BPD in the future (*Id.*).

Despite Ms. Wortham's assertions in support of her motion for summary judgment, the record evidence regarding key points is not undisputed. There are genuine issues of material fact in dispute that should be resolved by the fact finder at trial. When the Court construes the record evidence and all reasonable inferences in the light most favorable to the non-moving party, the Court cannot conclude that the moving party is entitled to judgment as a matter of law. For these reasons, the Court denies the motions for summary judgment filed by the City of Benton and Ms. Wortham.

### c.      Compensatory Damages

The City of Benton makes several arguments in support of its assertion that Ms. Wortham cannot recover compensatory damages against the City of Benton (Dkt. No. 38, at 15-16). The Court denies the City of Benton summary judgment on the issue of compensatory damages based on the legal authorities cited and record evidence before the Court. There are disputed issues of material fact regarding the policies in effect at the time of events at issue, whether those policies complied or comply with the requirements of the ADA, and whether regardless of the language of the policies there was a failure to train and implement the policy.

### B.     Arkansas Civil Rights Act Claim

The City of Benton also requests summary judgment in its favor on Ms. Wortham's Arkansas Civil Rights Act claim (Dkt. No. 38, at 16-21).  The Court denies the City of Benton summary judgment on the Arkansas Civil Rights Act claim based on the legal authorities cited and record evidence before the Court.

### V.     Conclusion

For the foregoing reasons, the Court denies the City of Benton's motion for summary judgment (Dkt. No. 38).  The Court also denies Ms. Wortham's motion for summary judgment (Dkt. No. 33).  The Court will set this matter for trial and will reset unexpired pretrial deadlines by separate Order.

It is so ordered this 13th day of September, 2021.

_____
Kristine G. Baker
United States District Judge